UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 08-60528-Civ-ZLOCH/Snow

RICHARD BOEHM,

         Plaintiff,

     vs.

MICHAEL J. ASTRUE, Commissioner
of Social Security,

        Defendant.
_____/

## REPORT AND RECOMMENDATION

THIS CAUSE is before the Court on the plaintiff's complaint seeking judicial review of a final decision of the Social Security Administration denying the plaintiff's application for disability and Supplemental Security Income (SSI) benefits. The complaint was filed pursuant to the Social Security Act, 42 U.S.C. § 401, et. seq., and was referred to United States Magistrate Judge Lurana S. Snow for report and recommendation.

## I. PROCEDURAL HISTORY

The plaintiff filed an application for SSI benefits on May 27, 2005, and an application for disability benefits on June 14, 2005, alleging disability since May 27, 2005, as a result of loss of energy and a blood clot in his lung. The applications were denied initially and upon reconsideration.

The plaintiff then requested a hearing which was held before Administrative Law Judge Dean W. Determan on April 18, 2007. The Administrative Law Judge found that the plaintiff was not disabled within the meaning of the Social Security Act. The Appeals Council denied the plaintiff's request for review on February 14, 2008. The plaintiff then filed this action seeking judicial review of the decision of the Commissioner.

## II. <u>FACTS</u>

The plaintiff was born on January 16, 1964, and was 41 years old at the time of his hearing. He has a high school education and his past relevant work was as a computer technician. The plaintiff has not worked since his discharge from employment in May 2005.

The medical record reflects that the plaintiff presented to the Coral Springs Medical Center emergency room on April 21, 2002, because he felt as though he was experiencing adrenal insufficiency. The plaintiff was admitted and discharged the following day. The hospital report reflects that the plaintiff suffered from hypopituitarism and diabetes, and was taking insulin, prednisone, Levoxyl, Florinef, hydrocortisone, Synthroid and Humalog. The plaintiff was treated with intravenous steroids and was instructed to double his hydrocortisone for the next few days. (R:548-49)

2

On March 26, 2003, the plaintiff presented to Selwyn Carrington, M.D., an endocrinologist who treated the plaintiff for insulin-dependent diabetes, hypothyroidism and Addison's disease. Dr. Carrington's treatment notes reflect that the plaintiff returned on May 1, 2003, suffering from hyperglycemia as a result of poorly controlled diabetes. (R:568-69)

On August 19, 2003, the plaintiff once again was admitted to Coral Springs Medical Center, complaining of chest pain. Myocardial infarction was ruled out and the plaintiff was diagnosed with mild gastritis. In October 2003, the plaintiff returned to Dr. Carrington complaining of persistent fatigue. (R:546, 564)

On March 10, 2004, the plaintiff again was hospitalized at the Coral Springs Medical Center for chest pain. There was no evidence that a cardiac event had occurred, and the plaintiff was diagnosed with chest pain, atypical; insulin dependent diabetes; history of Addison's disease; history of hypothyroidism, and family history of myocardial infarction. The plaintiff was discharged on March 11, 2004. (R:534-35)

The plaintiff returned to the Coral Springs Medical Center on August 23, 2005, once again complaining of chest pain. Myocardial infarction was ruled out, but it was noted that the plaintiff had a chronic elevation of liver function tests. (R:519-20).

3

On September 13, 2004, the plaintiff presented to the University Medical Center with chest pain.  On this occasion, myocardial infarction was ruled out, but a pulmonary embolism was discovered.  The plaintiff remained hospitalized until September 21, 2004, with discharge diagnoses of pulmonary embolism, corticoadrenal insufficiency/Addison's disease, panhypopituitism, diabetes mellitus, hypertension, hypothyroidism and depression. (R:104-07)

On November 23, 2004, the plaintiff was admitted to the Coral Springs Medical Center, complaining that for the preceding two weeks he had experienced weakness, dry cough and pleuritic chest pain.  The admitting diagnoses were vomiting, abdominal pain, elevated liver function tests, mild leukocytosis, history of pulmonary emboli, history of Addison's disease, history of hypothyroidism and history of diabetes mellitus.  The plaintiff was examined by Scott M. Fuchs, M.D., a gastroenterologist.  Dr. Fuchs noted that hospital records from August 2003 revealed that the plaintiff had a fatty liver, duodenal ulcers and Grade 1 erosive esophagus.  Dr. Fuchs' diagnostic impression was fatty liver, history of erosive esophagitis, history of duodenal ulcer, Addison's disease, rule out pulmonary embolus, rule out pneumonia. (R:499-501, 504)

4

On December 23, 2004, the plaintiff returned to the Coral Springs Medical Center complaining of dehydration and fever.  He was hospitalized overnight, with admitting diagnoses of strep pharyngitis, hypokalemia and abnormal liver enzymes.  A group A strep screen was positive.  Physical examination by Michael B. Sternthal, M.D., revealed that the plaintiff's dehydration likely was related to his fever due to streptococcal pharyngitis.  There was no evidence of gastrointestinal illness.  Abnormal liver tests were partly reactive and partly due to underlying fatty liver disease.  Hypokalemia may have been partly related to the plaintiff's adrenal insufficiency.  Elevated bilirubin was most consistent with Gilbert's syndrome, which had been exacerbated by a viral illness.  Dr. Sternthal recommended continued IV hydration and treatment for strep pharyngitis. (R:480-89)

On May 2, 2004, the plaintiff was admitted to Coral Springs Medical Center, complaining of weakness, dizziness, nausea, vomiting and skin rash.  He was treated with intravenous fluids and discharged on May 4, 2004.  Discharge diagnoses were hyponatremia, history of venous thrombosis and embolism, hypothyroidism, diabetes mellitus type 2, abnormal coagulation profile and dermatitis due to sunburn exposure. (R:470-71)

On May 27, 2004, X-rays of the plaintiff's lumbar spine revealed mild degenerative changes from L1-2 to L3-4. (R:160)

On July 23, 2005, a consultative examination of the plaintiff was performed by John Catano, M.D., a family physician. Dr. Catano noted that the plaintiff had been diagnosed with Addison's disease at the age of 18, and later developed diabetes mellitus and hypothyroidism.  He was taking multiple medications for these conditions.  The plaintiff told Dr. Catano that he had been experiencing progressive fatigue, sleepiness and anthralgias involving all major joints and hands.  The plaintiff stated that he had difficulty standing, walking, lifting and household chores. (R:261)

Physical examination of the plaintiff revealed that all joints appeared normal with normal range of motion.  There was no evidence of inflammatory or deforming arthritis or arthropathy of any joint.  The plaintiff's gross and fine manipulation were intact; he was able to button and unbutton his shirt and to pick up coins.  There was some tenderness and spasms on paraspinalis muscle, but straight leg raises in seated and supine positions were negative.  The plaintiff's gait was antalgic without assisting device.  The plaintiff could get in and out of a chair and on and off the examining table with little difficulty.  Range of motion of the low back was to 60 degrees of anterior flexion.  The plaintiff could not tandem walk and walked on his heels and toes with some difficulty.  Dr. Catano's diagnostic impression was history of

Addison's disease with chronic fatigue syndrome; history of diabetes mellitus with insulin pump, and generalized anthralgias. (R:262-63)

On July 26, 2005, Robert E. Seifer, Ph.D., a psychologist, performed a consultative psychological evaluation of the plaintiff. The plaintiff told Dr. Seifer that he suffered from multiple medical problems, including Addison's disease, diabetes, thyroid and pituitary gland problems, bad knees, arthritis in all joints and a blood clot in his lungs. The plaintiff reported that recently he had experienced short-term memory problems. He rated his pain during the interview as 8 on a scale of 1 to 10. (R:267)

The plaintiff denied any psychological problems or history. He stated that he had been fired from his job on May 27, 2005, based on accusations that he was on an Internet site, which the plaintiff denied. He told Dr. Seifer that he was fighting his discharge and was reluctant to discuss his job other than to say that he worked at a desk with computers. (R:267-68)

The plaintiff was oppositional during the evaluation, wondering what the questions posed had to do with anything, but did respond to all of Dr. Seifer's inquiries. The plaintiff reported being able to perform all tasks associated with daily functions, but stated that he was easily fatigued and in pain, and needed to take breaks very fifteen minutes. He appeared to have minimal

difficulty with attention and concentration during the interview. Dr. Seifer deferred diagnosis on Axis I and Axis II and assessed a GAF of 68. (R:268)

On November 7, 2005, the plaintiff presented to the Coral Springs Medical Center, complaining of chest pain. Admitting assessments were atypical chest pain, most likely musculoskeletal, with no evidence of myocardial infarction; history of pulmonary embolism; history of Addison's disease with chronic hyponatremia; history of subtherapeutic INR; history of hypertension and poorly controlled diabetes mellitus. No pulmonary embolism was present and the plaintiff was discharged on November 9, 2005. (R:454-59)

On January 4, 2006, the plaintiff returned to the Coral Springs Medical Center suffering from bronchitis. Admitting assessments were acute bronchitis, rule out underlying pneumonia; subtherapeutic INR; Addison's disease, and elevated liver function tests. There was no evidence of pulmonary embolism and plaintiff was treated with intravenous antibiotics. He was discharged on January 9, 2006. (R:292, 444-53)

On April 12, 2006, Anthony Gallo, D.C., authored a letter detailing the plaintiff's chiropractic treatment. Dr. Gallo related that the plaintiff had begun treatment on September 5, 2005, for pain in his neck, low back, shoulders and legs. On examination, the plaintiff exhibited a decrease in range of motion

in the cervical and lumbar spine with pain on extension of the cervical spine. Treatment included massage therapy, electric muscle stimulation, hydrocollator therapy and stretching exercises, in addition to chiropractic adjustments. Dr. Gallo's diagnosis was lumbar and cervical radiculitis, as well as shoulder and leg pain. Dr. Gallo opined that the plaintiff had limited abilities to function at normal work levels, and that excessive sitting, computer work or lifting and bending was detrimental to his health. (R:309-10)

On July 18, 2006, the plaintiff returned to the Coral Springs Medical Center with complaints of chest pain. Admitting assessments were chest pain, most likely musculoskeletal; history of pulmonary embolism; slightly subtherapeutic INR; Addison's disease; hypothyroidism; chronic hyponatremia, and insulin-dependent diabetes mellitus. Electrocardiogram and chest x-ray were normal, and the plaintiff was discharged on July 19, 2006. (R:425-31)

On October 28, 2006, the plaintiff was hospitalized at the Imperial Point Medical Center with complaints of diarrhea, sore throat and feeling syncopal. The admission diagnosis was diabetes and the plaintiff was treated for electrolyte imbalance, abnormal liver tests and dyspepsia. The diagnostic impression of the consulting psychiatrist, Shobha Gupta, M.D., was anxiety, agitation

and noncompliance.  The plaintiff refused psychiatric evaluation
and follow-up. He was discharged on January 20, 2006, with
instructions to stay on a diabetic diet, with no restrictions in
activities (as tolerated). (R:360-71)

On January 14, 2007, the plaintiff was admitted to
Northwest Medical Center, with an admitting diagnosis of Addison's
disease with poor compliance with medications.  The plaintiff
complained of nausea, vomiting, diarrhea, and he developed right
anterior chest pain on the date of admission.  The plaintiff was
treated for hypertension and dehydration.  Upper endoscopy revealed
duodenal ulcers, which appeared to be the cause of the plaintiff's
abdominal and chest pain.  The plaintiff was discharged on January
20, 2007, with instructions to resume his diabetic diet. (R:386-87)

During this hospitalization, the plaintiff was examined
by Chang-Lim Kim, M.D., an endocrinologist.  On January 26, 2007,
the plaintiff followed up with Dr. Kim, complaining of numbness in
his face.  Dr. Kim diagnosed Addison's disease and hypothyroidism.
The plaintiff returned to Dr. Kim on February 16, 2007, complaining
of fatigue and tiredness.  (R:554-58)

On February 16, 2007, Dr. Kim completed a Medical Source
Statement of Ability to Do Work-Related Activities (Physical), in
which he opined that the plaintiff could lift less than ten pounds
occasionally and frequently; stand and/or walk for less than two

hours in an eight hour workday; sit for about six hours in a workday, and had an unlimited ability to push and/or pull. These limitations were the result of Addison's disease. Dr. Kim further stated that the plaintiff could occasionally climb, balance, kneel, crouch crawl and stoop. He was limited in his ability to reach overhead, but could occasionally handle, finger and feel. These restrictions were the result of the plaintiff's arthritis in his knees, shoulders and hands. The plaintiff had no visual limitations and could tolerate exposure to noise, dust, vibration and humidity. However, his Addison's disease, diabetes, hypertension and arthritis restricted him from exposure to temperature extremes, hazards such as machinery and heights and fumes, odors, chemicals and gasses. (R:397-400)

On March 2, 2007, the plaintiff was admitted to Coral Springs Medical Center with complaints of dizziness and hyperglycemia. He was treated with intravenous insulin. The plaintiff was told that his diabetes was not well controlled and he was not taking his medications properly. The plaintiff stated that he wanted to manage his own insulin with his own sliding scale and refused any prescriptions at the time of discharge other than a prescription for Neurontin for neuropathy. The plaintiff was discharged on March 4, 2007. (R:401-11)

On March 16, 2007, the plaintiff returned to Dr. Kim for treatment, reporting fatigue, tiredness and swelling in his right leg.  Dr. Kim once again diagnosed Type II diabetes, Addison's disease and hypothyroidism and continued to treat the plaintiff with medication. (R:553)

On April 17, 2007, Dr. Carrington authored a letter stating that he was the plaintiff's treating endocrinologist from 1997 to 2005.  Dr. Carrington stated that the plaintiff suffered from Addison's disease, hypothyroidism, hypgonadotrophic hypogonadism, diabetes mellitus and chronic fatigue.  The doctor reported that the plaintiff had not been able to achieve maximal therapeutic improvement, which has left him with persistent fatigue.  Dr. Carrington opined that the plaintiff's illnesses were not curable and would worsen as his life continued.  Dr. Carrington explained that he had not produced a complete copy of the plaintiff's chart because the chart had been misplaced in his office. (R:560)

At the administrative hearing, the plaintiff testified that his last job was at Press Data, where he worked for seven years.  The plaintiff acknowledged that he had been fired because of an allegation that he was on the Internet, but stated that he was unable to do the work because he was falling asleep at his desk.  He was in the hospital a lot and at lunchtime he would go

12

take a nap in his car.  If he had not been fired, he could not have kept working much longer.  The plaintiff believed that the real reason he was fired was because it was costing his employer a great deal of money for insurance.  (R:585, 592-93)

The plaintiff stated that each day when he got up, he took his son to school, then returned home and went to sleep.  The plaintiff said he could not really do anything; he could not sit up or stand for a long period of time.  He spent half of each day lying down.  The plaintiff also testified that he had arthritis in his fingers, which made it difficult for him to pick up things.  He had pain in his back and neck all the time, as well as pain in his stomach from an ulcer. (R:590-91)

### III. DECISION OF THE ALJ

The ALJ first found that the plaintiff met the insured status requirements of the Social Security Act through December 31, 2010; that he had not engaged in substantial gainful activity since May 27, 2005, the alleged disability onset date; and that he had a severe combination of impairments consisting of Addison's disease, hypothyroidism, hypogoadoptrophic hypogonadism, diabetes mellitus and chronic fatigue.  However, the plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R:17)

13

The ALJ summarized the plaintiff's testimony and the medical evidence of record (R:18-20) and found that the plaintiff carried diagnoses of Addison's disease, hypothyroidism, hypogonadism and insulin dependent diabetes. However, the ALJ noted that there were few progress notes from treating physicians that demonstrated that the plaintiff was incapacitated by these medical conditions. The progress notes that were in the record revealed that the plaintiff was followed for his conditions and was prescribed multiple medications to control his endocrine related problems, hypertension and diabetes. The plaintiff's complaints of persistent, unrelenting fatigue, while noted by Dr. Carrington and associated with his diagnoses, were not well documented in the record. (R:21)

Similarly, the ALJ pointed out that there were few progress notes to indicate that the plaintiff's condition was as poor as Dr. Kim had assessed. Although there were numerous hospital admissions, an examination of the plaintiff's admission diagnoses revealed that he was seen once for a pulmonary embolism that resolved with anticoagulation therapy in September 2004. Thereafter, the plaintiff returned several times for chest pain that was considered to be atypical and often musculoskeltal in nature without evidence of a recurrent embolism or cardiac related condition. The plaintiff also was treated in the hospital for

14

bronchitis and strep throat. His elevated liver function was felt to be due to a fatty liver and whatever illness the plaintiff had presented with, and the plaintiff's blood work generally returned to normal after his condition resolved. (R:21)

Additionally, the ALJ noted that the plaintiff had low INRs on several occasions and was found to be not compliant with his medications for diabetes and Addison's disease on several occasions. The plaintiff's problems, including dehydration and potassium imbalance, were corrected during his hospital stays. While the plaintiff reported neuropathy secondary to his diabetes, there was little evidence of neurological involvement. The ALJ concluded that while the medical evidence substantiated the existence of multiple medical conditions that impacted on the plaintiff's ability to function, the plaintiff's claims of the extent to which those impairments impacted on his ability to function was not supported by the record as a whole. Moreover, the record failed to indicate that the plaintiff could not perform the full range of unskilled sedentary work. (R:21-22)

The ALJ concurred with the state agency medical consultant, who found that the plaintiff could lift 10 pounds occasionally and less than 10 pounds frequently; could stand/walk for at least 2 hours and sit for about 6 hours in an 8 hour workday; did not have pushing and pulling limitations, could

perform occasional postural activities, and was to avoid even moderate exposure to extreme heat and cold, wetness, humidity and hazards. The ALJ stated that this assessment was supported by the July 2005 consultative examination performed by Dr. Catano. However, the ALJ rejected the May 2006 finding of the state agency consultant that the plaintiff could perform light work, finding that such work was beyond the plaintiff's physical capabilities. (R:22)

The ALJ found that Dr. Gallo's statements that the plaintiff was incapacitated by a musculoskeletal condition were not supported by objective testing or progress notes from Dr. Gallo himself or any other physician. Similarly, Dr. Carrington's statements regarding the plaintiff's inability to achieve improvement through medication and his persistent fatigue were not supported by the few progress notes from 2003 that the doctor had submitted. Finally, the ALJ found that Dr. Kim's assessment of the plaintiff's functioning appeared to be generally consistent with the ability to perform sedentary work, except for the doctor's statement that the plaintiff could stand or walk for less than 2 hours per day. Dr. Kim did not explain why Addison's disease would prevent the plaintiff from standing or walking for 2 hours or more. (R:22-23)

Since there was no specific reason given for the plaintiff's inability to stand or walk for at least two hours per day from an endocrinological, orthopedic or neurological standpoint, the ALJ found that the plaintiff was able to do so. Additionally, the ALJ gave some credence to the plaintiff's testimony that he suffered from fatigue as a result of his medical conditions, which limited the plaintiff to performing unskilled work that did not require him to concentrate and focus on more than simple, repetitive tasks. (R:23)

Accordingly, the ALJ found that the plaintiff was unable to perform his past relevant work as a computer technician, which is classified as skilled light work. Since the plaintiff was a "younger individual" (18-44), had a high school education and was able to communicate in English, and retained the residual functional capacity to perform the full range of sedentary work, there were jobs that existed in significant numbers in the national economy that the plaintiff could perform. Therefore, the Medical-Vocational Guidelines ("Grids") directed a finding that the plaintiff was not disabled for purposes of the Social Security Act.

## IV. CROSS MOTIONS FOR SUMMARY JUDGMENT

The plaintiff seeks reversal or remand on several grounds. First, he contends that the ALJ erred in finding that the plaintiff retained the residual functional capacity to perform the

17

full range of sedentary work because the plaintiff's frequent hospitalizations demonstrated that the plaintiff could not work on a regular or continuing basis.

Next, the plaintiff argues that the ALJ erred in relying on the Grids because the ALJ found that the plaintiff's fatigue was a significant non-exertional impairment which limited the plaintiff to performing unskilled work.  Additionally, the ALJ was required to determine how many breaks the plaintiff would require in an 8 hour workday and how many days per month the plaintiff would be absent from work as a result of his impairments.

Third, the plaintiff asserts that the ALJ failed to consider the plaintiff's impairments involving in neck and low back pain, anthralgias and arthritis.  The ALJ did not articulate whether these impairments were severe and did not consider them in conjunction with the plaintiff's other impairments.

Fourth, the plaintiff states that the ALJ erred by not according proper weight to the opinions of the plaintiff's treating physicians, particularly Dr. Kim.  Finally, the plaintiff contends that the ALJ should have utilized a medical expert to establish the correct disability onset date.

The Commissioner argues that the AlJ's decision was supported by substantial evidence and the correct legal standards were applied, warranting affirming of the decision below.

## V. RECOMMENDATIONS OF LAW

At issue before the Court is whether the final decision of the Commissioner, as reflected by the record, is supported by substantial evidence.  "Even if the evidence preponderates against the Secretary, we must affirm if the decision is supported by substantial evidence." Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1985).  Substantial evidence is defined as such relevant evidence as a reasonable mind would accept as adequate to support a conclusion.  Richardson v. Perales, 402 U.S. 389 (1971); Bloodsworth v. Heckler, 703 F.2d 1233 (11th Cir. 1983).  The Court must review the record as a whole to determine if the decision is supported by substantial evidence.  Bloodsworth, 703 F.2d at 1239. The Court must also determine whether the Administrative Law Judge applied the proper legal standards.  No presumption of validity attaches to the Commissioner's determination of the proper legal standards to be applied.  Richardson, supra.

In making a disability determination, the ALJ must perform the sequential evaluation outlined in 20 C.F.R. § 404.1520. First the claimant must not be engaged in substantial gainful activity after the date the disability began.  Second the claimant must provide evidence of a severe impairment.  Third, the claimant must show that the impairment meets or equals an impairment in Appendix 1 of the Regulations. If the claimant fails to provide

sufficient evidence to accomplish step three, the analysis proceeds
to step four.  In step four, the ALJ must determine the claimant's
residual functional capacity, then determine if the claimant can
perform his or her past relevant work.  The claimant has the burden
of proving the inability to perform past relevant work. If the
claimant's evidence shows an inability to perform past relevant
work, the burden shifts to the ALJ in step five.  The ALJ must show
that there is other gainful work in the national economy which the
claimant can perform.   Once the ALJ identifies such work, the
burden returns to the claimant to prove his or her inability to
perform such work.

A. **Whether Plaintiff's Impairments of Arthritis, Anthralgias and
Low Back and Neck Pain Were "Severe"**

        The plaintiff contends that the ALJ failed to consider
whether his impairments of arthritis, anthralgias and low back and
neck pain were "severe" for purposes of step two of the sequential
evaluation.  The Commissioner concedes that the ALJ failed to make
this determination, but argues that the error was harmless because
the  ALJ  considered  these  impairments  in  combination  when
determining the plaintiff's residual functional capacity.

        An impairment "is not severe only if it is a slight
abnormality which has such a minimal effect on the individual that
it would not be expected to interfere with the plaintiff's ability

20

to work, irrespective of age, education or work experience."
McDaniel v. Bowen, 800 F.2d 1026, 1031 (11th Cir. 1986), citing
Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984).  Step two
"allows only claims based on the most trivial impairments to be
rejected."  McDaniel, 800 F.2d at 1031.  As a result, the
"claimant's burden at step two is mild."  Id.

        In the instant case, the plaintiff's chiropractor, Dr.
Gallo related that the plaintiff had begun treatment on September
5, 2005, for pain in his neck, low back, shoulders and legs.  On
examination, the plaintiff exhibited a decrease in range of motion
in the cervical and lumbar spine with pain on extension of the
cervical spine.  Dr. Gallo's diagnosis was lumbar and cervical
radiculitis, as well as shoulder and leg pain.  Dr. Gallo opined
that the plaintiff had limited abilities to function at normal work
levels, and that excessive sitting, computer work or lifting and
bending was detrimental to his health.

        The ALJ rejected Dr. Gallo's statements on the basis that
they were not supported by objective testing or progress notes from
either himself or any other physician that demonstrate that the
plaintiff was incapacitated by a musculoskeletal condition.
However, the ALJ made no mention of Dr. Kim's Medical Source
Statement of Ability to Do Work-Related Activities (Physical),
indicated that the plaintiff could occasionally climb, balance,

kneel, crouch crawl and stoop.  He was limited in his ability to reach overhead, but could occasionally handle, finger and feel. These restrictions were the result of the plaintiff's arthritis in his knees, shoulders and hands.

Similarly, although the ALJ gave some credence to the plaintiff's complaint of fatigue, he did not specifically address the plaintiff's complaints of pain.  The plaintiff testified that he had arthritis in his fingers, which made it difficult for him to pick up things.  He also had pain in his back and neck all the time, as well as pain in his stomach from an ulcer.

Pain must be evaluated by considering the "evidence of an underlying medical condition, and either (1) objective medical evidence to confirm the severity of the alleged pain arising from that condition, or (2) that the objectively determined medical condition is of a severity that can reasonably be expected to give rise to the alleged pain." Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  The ALJ also can consider the plaintiff's daily activities, the precipitating factors and the effect of medication and other treatment. 20 C.F.R. 1529(3).  "A claimant's subjective testimony supported by medical evidence that satisfies the pain standard is itself sufficient to support a finding of disability." Foote, 67 F.3d at 1561.

The ALJ relied on the assessment of the consultative physician, Dr. Catano, to support his conclusion that the plaintiff could perform the full range of sedentary work.  However, Dr. Catano also found tenderness and spasms on paraspinalis muscle, and noted that the plaintiff's gait was antalgic.  Additionally, the plaintiff could not tandem walk and walked on his heels and toes with some difficulty.  Dr. Catano's diagnostic impression included generalized anthralgias.

The undersigned finds that the ALJ's failure to assess whether the plaintiff's impairments of arthritis, anthralgias and low back and neck pain were "severe" at step two of the sequential evaluation process was not harmless error.  The ALJ made no mention of the opinion of Dr. Kim, one of the plaintiff's treating physicians, regarding these limitations, stating only that Dr. Kim's assessment was generally consistent with the ability to perform sedentary work.  However, SSR 96-9P (1996) states, in pertinent part:

> Most unskilled sedentary jobs require good use of both hands and the fingers, i.e., bilateral manual dexterity.  Fine movements of small objects require the use of the fingers, e.g., to pick or pinch.  Most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions.
>
> Any *significant* manipulative limitation of an individual's ability to handle and work with small objects with both hands will result

in a significant erosion of the unskilled sedentary occupational base.

The ALJ failed to determine what, if any, impact the plaintiff's arthritis and anthralgias had on his ability to perform the full range of sedentary work, and he ignored both the plaintiff's testimony regarding pain and Dr. Kim's assessment that the plaintiff could handle, finger and feel only occasionally. Therefore, this case should be remanded so that the ALJ can address the issue of whether the plaintiff's impairments of arthritis, anthralgias and low back and neck pain were severe and, if so, whether these impairments impacted on the plaintiff's ability to perform the full range of sedentary work.

**B.** **Weight Accorded to the Opinion of The Plaintiff's Treating Physician**

The plaintiff also argues that the ALJ erred in failing to accord controlling weight to the opinion of Dr. Kim, his treating endocrinologist, who stated that the plaintiff could stand or walk for less than two hours in an eight hour workday. The ALJ found Dr. Kim's statement that this limitation was the result of Addison's disease was insufficient because Dr. Kim failed to articulate why Addison's disease caused an inability to stand or walk for two hours or more.

The testimony of a treating physician must be given considerable weight unless "good cause" is shown to the contrary,

24

and failure of the ALJ to clearly articulate the reasons for giving lesser weight to the opinion of a treating physician constitutes reversible error. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997); MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986); 20 CFR §§ 404.157(d)(2), 416.927(d)(2)(1999). This Circuit has held that the requisite "good cause" exists where the treating physician's opinion is not supported by the evidence, where the evidence supported a contrary finding, or where the physician's opinion was conclusory or inconsistent with their own medical records. Lewis, 125 F.3d at 440; Jones v. Department of Health & Human Services, 941 F.2d 1529, 1532-3 (11th Cir. 1991); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991).

In the instant case, the ALJ stated, "As there is not specific reason given for the claimant's inability to stand/walk for at least 2 hours a day from an endocrinological, orthopedic or neurological standpoint, the undersigned finds that he is able to do so." (R:23)  Arguably, this statement suggests that the ALJ rejected Dr. Kim's assessment on the ground that it was conclusory.

The ALJ found that the plaintiff suffered from Addison's disease, a severe impairment, and the undersigned concludes that Dr. Kim's failure to list the symptoms of this disease on a form is not a sufficient basis to discount the doctor's opinion. Therefore, on remand, if the ALJ determines that Dr. Kim's opinion

25

on this point should not be given considerable weight, the ALJ should state whether the doctor's opinion is not supported by the evidence, whether the evidence supported a contrary finding, or whether his opinion was conclusory or inconsistent with his own medical records. <u>Lewis</u>, 125 F.3d at 1440.

C. **<u>Use of the Medical-Vocational Guidelines</u>**

The plaintiff contends that the ALJ erred in using the Medical Vocational Guidelines to determine that the plaintiff was not disabled.  He points out that the ALJ found that the plaintiff suffered from the severe impairment of chronic fatigue, and this impairment limited the plaintiff to performing unskilled work that did not require him to concentrate and focus on more than simple, repetitive tasks.  The plaintiff argues that fatigue is a non-exertional impairment which precludes the plaintiff from performing the full range of sedentary work and, therefore, the ALJ was required to elicit testimony from a vocational expert to determine if there are jobs existing in the national economy that the plaintiff can perform.

Where a claimant has a non-exertional impairment that significantly limits his basic work skills, or the claimant cannot perform a full range of employment at the appropriate level of exertion, the ALJ may use the Medical Vocational Guidelines (Grids) as a framework to evaluate vocational factors, but also must

introduce independent evidence, preferably through a vocational expert's testimony, of the existence of jobs in the national economy that the plaintiff can perform.  Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996); Welch v. Bowen, 854 F.2d 436, 439-40 (11th Cir. 1988).  It is only when the claimant is capable of unlimited types of work, that it is unnecessary to call a vocational expert to establish whether the claimant can perform work that exists in the national economy.  Foote v. Chater, 67 F.3d 1553, 1559 (11th Cir. 1995); Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992).

In the instant case, the Commissioner points out that the medical-vocational guidelines take administrative notice solely of unskilled jobs in the national economy.  20 C.F.R. part 404 subpart P, appendix 2, Section 200.  The Commissioner argues that, as a result, the plaintiff's nonexertional limitation to simple, repetitive tasks does not significantly compromise his capacity for the full range of sedentary work.  The Commissioner's argument presumes that all unskilled sedentary jobs involve simple, repetitive tasks, but the only authority for this proposition he cites is the AlJ's opinion.  Clearly such reasoning is circular.

SSR 96-9P states that unskilled sedentary work involves nonexertional activities "such as capacities for seeing, manipulation, and understanding, remembering and carrying out

simple instructions."  The undersigned was not able to find any definition or description of unskilled sedentary work which explicitly limits such work to the performance of simple, repetitive tasks.

In Scott v. Shalala, 30 F.3d 33 (5th Cir. 1994), the ALJ had acknowledged that the plaintiff might have slight occasional breaks in attention due to pain.  Since pain is a nonexertional factor which could limit the range of jobs the plaintiff could perform, the court held that the ALJ was required to rely on expert vocational testimony to establish that jobs existed.  Scott, 30 F.3d at 35.

Here the ALJ found that the plaintiff was unable to concentrate and focus on more than simple repetitive tasks as the result of fatigue.  The undersigned does not believe that this case is distinguishable from Scott, supra, simply because it was pain rather than fatigue which limited the plaintiff's ability to focus.

The undersigned concludes that the ALJ found that the plaintiff had a nonexertional impairment which prevented him from performing the full range of sedentary work, and the ALJ was required to elicit testimony from a vocational expert to determine whether there were jobs in the national economy that the plaintiff could perform.  Therefore, the ALJ erred in relying on the medical

vocational guidelines and, on remand, the ALJ should obtain testimony from a vocational expert.

D. **Whether The Plaintiff Could Work on a Regular and Continuous Basis**

The plaintiff asserts that the ALJ erred in finding that he retained the residual functional capacity to work on a regular and continuous basis because of the plaintiff's frequent hospitalizations. The plaintiff relies SSR 96-8P (1996), which provides that in assessing residual functional capacity, "the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuous basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule). . . ."

This ruling does not address the issue of frequent absences. Moreover, the ALJ noted in his summary of the plaintiff's hospitalizations, an examination of the plaintiff's admission diagnoses revealed that he was seen once for a pulmonary embolism that resolved with anticoagulation therapy in September 2004. Thereafter, the plaintiff returned several times for chest pain that was considered to be atypical and often musculoskeltal in nature without evidence of a recurrent embolism or cardiac related condition. The plaintiff also was treated in the hospital for bronchitis and strep throat. His elevated liver function was felt

29

to be due to a fatty liver and whatever illness the plaintiff had presented with, and the plaintiff's blood work generally returned to normal after his condition resolved.

Although the plaintiff has made many trips to hospital emergency rooms, the record does not demonstrate that the plaintiff's medical conditions would require so many hospital admissions as to preclude him from an ordinary work schedule. Accordingly, neither reversal nor remand is warranted on this ground.

**E. Use of a Medical Expert to Establish Disability Onset Date**

Finally, the plaintiff states that a medical expert was required to establish the onset date of the plaintiff's disability. As the Commissioner correctly points out, the ALJ found that the plaintiff was not disabled, rendering moot the issue of onset date. If, on remand, the plaintiff is found to be disabled, a medical expert may be called to assist in determining the disability onset date if that date is in question.

**VI. CONCLUSION**

This Court having considered carefully the pleadings, arguments of counsel, and the applicable case law, it is hereby

RECOMMENDED that the plaintiff's Motion for Summary Judgment (DE 11) be GRANTED, in part, in that the case should be remanded to the Commissioner for a determination of:

(1) whether the plaintiff's impairments of arthritis, anthralgias, and low back and neck pain were "severe" at step two of the sequential evaluation and, if so, whether these impairments impacted the plaintiff's ability to perform the full range of sedentary work;

(2) whether, under the applicable legal standards, the opinion of the plaintiff's treating physician should be given less than considerable weight, and, if so,

(3) whether, based on the testimony of a vocational expert, jobs exist in the national economy which the plaintiff can perform.

It is further

RECOMMENDED that the Commissioner's Motion for Summary Judgment (DE 16) be DENIED.

The parties will have ten days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, for consideration by The Honorable William J. Zloch, United States District Judge.  Failure to file objections timely shall bar the parties from attacking on appeal factual findings contained herein.  LoConte v. Dugger, 847

F.2d 745 (11th Cir. 1988), <u>cert. denied</u>, 488 U.S. 958 (1988); <u>RTC</u>

<u>v. Hallmark Builders, Inc.</u>, 996 F.2d 1144, 1149 (11th Cir. 1993).

      DONE AND SUBMITTED at Fort Lauderdale, Florida, this

15th day of April, 2009.

                    _____
                    LURANA S. SNOW
                    UNITED STATES MAGISTRATE JUDGE

Copies to:

Nora Staum, Esq. (P)
AUSA Rachel Entman (D)

32